January 27, 2021

**VIA ECF**

Honorable Kandis A. Westmore
United States District Court, Northern District of California
Oakland Courthouse
1301 Clay Street, Oakland, CA 94612

  Re: *Edwards Lifesciences Corporation et al v. Meril Life Sciences Pvt. Ltd. et al,*
     *Case 4:19-cv-06593-HSG – Protective Order*

Dear Judge Westmore:

  Plaintiffs Edwards Lifesciences Corporation and Edwards Lifesciences LLC ("Edwards") and Defendants Meril Life Sciences Pvt. Ltd. and Meril, Inc. ("Meril") (collectively, the "Parties") seek the Court's guidance on their dispute concerning entry of an appropriate protective order, as described below. Following telephonic meet and confers on December 7, 2020 and December 31, 2020 and continued email correspondence on January 6, 2021 and January 13, 2021, a dispute remains. Consistent with the Court's prior ruling (Dkt. No. 92), a redline of the parties' competing protective order proposals is not attached. Declarations of Ryan Lindsey and Avraham Schwartz, the two Edwards in-house attorneys seeking access to materials under the protective order, are attached hereto as **Exhibits A and B**, respectively.

  Sincerely,

*/s/ Steven Hanle*             */s/ Melanie L. Mayer*
Steven Hanle                Melanie L. Mayer
Attorney for Edwards            Attorney for Meril

January 27, 2021
Page One

### I. Edwards' Position: Edwards' Proposal is Consistent with This District's Model Protective Order and Is Appropriate for this Case

The parties submitted this issue to the Court to address whether to include the optional language in this District's Model Stipulated Protective Order for Litigation Involving Patents ("Model Order") under which in-house counsel may be permitted to receive information designated "Highly Confidential – Attorneys' Eyes Only" ("HCAEO"). (Dkt. No. 61). The Court stated that it would not "outrightly deny in-house counsel access to highly confidential documents simply because Meril does not have an in-house legal department," but found that Edwards had not provided information about its two in-house attorneys to determine if they are involved in competitive decision making. (Dkt. No. 92 at 2-3.) The Court noted that "declarations from the Edwards attorneys outlining their experience, current roles, how they are involved in litigation, and whether they are involved in competitive decision making could support the inclusion of the optional language." (Dkt. No. 92 at 3.) Edwards has provided declarations containing these details, but Meril has refused to consent to Edwards' attorneys' access. Significantly, Meril has not identified the purported "competitive advantage" Edwards would gain by in-house counsel's access to the data backing up its public representations about Myval's safety and efficacy.

Edwards has more than 14,000 employees, and a large, sophisticated legal department with in-house counsel whose primary responsibility is to direct outside counsel's representation of Edwards in intellectual property litigation. Two of these in-house counsels responsible for managing this case, Ryan Lindsey and Avraham Schwartz, are not involved in competitive decision-making. Given Edwards' size, their role is akin to the advisory role of outside counsel whose only client is Edwards. Messrs. Lindsey and Schwartz are in the best position to evaluate materials produced in this case for purposes of litigation strategy and settlement, to identify the Edwards employees (among thousands) that can provide background information needed to analyze the issues raised by Meril's confidential documents (without disclosing their content), and to identify experts. Edwards contends that the protective order should permit no more than two such in-house counsel to review information designated HCAEO.

Edwards has provided Meril with declarations from Messrs. Lindsey and Schwartz. Mr. Lindsey's responsibilities, as they relate to the subject matter here, concern managing outside counsel representing Edwards in litigation and do not include advising on strategic pricing and other sales-related commercial activity, research or development. (Ex. A ¶¶4, 6.) He reports to the Chief Intellectual Property Counsel, who in turn reports to Edwards' general counsel (neither of whom seeks access to protective order materials). (Ex. A ¶4.) Mr. Schwartz reports to Mr. Lindsey and has the same general responsibilities. (Ex. B ¶4.) Significantly, neither attorney advises on regulatory affairs, including the propriety of representations concerning safety and effectiveness of devices, or patent prosecution, and both have agreed to be bound by the prosecution bar in the proposed protective order. (Ex. A ¶6; Ex. B ¶6.) These attorneys' intimate familiarity with Edwards' personnel, resources, and medical device practice generally make them essential members of Edwards' litigation team.

Free flow of information between outside and in house counsel is essential to an effective representation, and an attorney's status as "house counsel" cannot alone serve as the basis for denying access to information relevant to a lawsuit. *See U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1469 (Fed. Cir. 1984); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992) (stating that the "crucial factor" is whether the in-house counsel engages in "competitive decision-making"); *see also ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 274 F.R.D. 576, 581 (E.D. Va. 2010)

January 27, 2021
Page Two

(finding that in-house counsel was "not involved in competitive decisionmaking such that he should be denied access to confidential information").  "[C]ompetitive decisionmaking" refers to a "counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor."  *U.S. Steel Corp.*, 730 F.2d at 1468 n.3.

Unlike any of the cases Meril cites, this case concerns the veracity of ***public*** representations about the safety and efficacy of Meril's Myval device.  Discovery will involve the data allegedly backing up these ***public*** representations, which lack even theoretical importance to Edwards outside of this litigation, and would not give Edwards any competitive advantage.  This information concerning patient treatment results is thus distinguishable from, for instance sensitive documents pertaining to pricing, market share, and research and development of a medical device, as addressed in the patent cases cited by Meril.  There is simply no commercial value associated with the data underlying these representations that Edwards could use for "decisions . . . made in light of similar or corresponding information about a competitor" or derive a conceivable "tactical advantage."  *See U.S. Steel*, 730 F.2d at 1468 n.3.  Regardless, as officers of the Court Messrs. Lindsey and Schwartz have represented that they are not involved in pricing or technical design of products and as such are isolated from any potentially competitive decisions that could conceivably relate to such information.  *See, e.g., Matsushita Electric Industrial Co., Ltd. v. United States*, 929 F.2d 1577 (Fed. Cir. 1991); *Glaxo, Inc. v. Genpharm Pharm., Inc.*, 796 F. Supp. 872, 874 (E.D.N.C. 1992) (allowing access in face of "uncontroverted affidavits that [lawyer had] no involvement in and gives no advice to Glaxo about competitive decisions such as pricing, scientific research, sales or marketing"); *Fluke Corp. v. Fine Instruments Corp.*, No. C94-573C, 1994 U.S. Dist. LEXIS 16286, at *16 (W.D. Wash. Oct. 5, 1994) ("Mr. Koske is not involved in the design or development of Fluke products, therefore any knowledge based on his expertise as a patent attorney will not be transferred to Fluke's advantage.").  "Mere correspondence with competitive decisonmakers or attendance at competitive decisionmaking meetings does not itself constitute competitive decisionmaking."  *ActiveVideo Networks, Inc.*, 274 F.R.D. at 581 (citing *Matsushita*, 929 F.2d at 1580).  To the extent Messrs. Lindsey and Schwartz have contact with competitive decision makers, they are well isolated from competitive decision-making.

Edwards accordingly proposes a protective order that includes the optional provision in the Model Order under which in-house counsel "who ha[ve] no involvement in competitive decision-making, [and] (2) to whom disclosure is reasonably necessary for this litigation" may be permitted to receive information designated HCAEO.  (Model Order ¶¶ 2.4, 7.3.)  The proposed "prosecution bar" obviates Meril's purported concern with Mr. Schwartz's IPR involvement.[1]  Messrs. Lindsey and Schwartz have regularly been granted access to HCAEO materials in cases involving Edwards' direct and much larger competitors.  These orders, like the Model Order, adequately address Meril's concerns regarding sensitive data by ensuring that such in-house counsels are not involved in competitive decision-making.  (*See* Protective Order, *Edwards Lifesciences Corp. v. Abbott Cardiovascular Sys., Inc.*, Case No. 8:19-cv-00345-JLS-JDE, Dkt. No. 54 (C.D. Cal. Sept. 17, 2019; Stipulated Revised Protective Order on Confidentiality, *Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*,

---

[1] If full access is denied, Edwards contends that Mssrs. Linsey and Schwartz at minimum should be allowed access under conditions that "[f]or example, . . . may be limited to viewing 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' information only if it is filed with the court under seal, or in the presence of Outside Counsel of Record at their offices."  *See* Model Order at ¶ 7.3 n.4.

Case No. 19-149-MN, Dkt. No. 221 (D. Del. Sept. 13, 2019); Stipulated Protective Order, *Boston Scientific Corp. v. Edwards Lifesciences Corp.*, Case No. 16-275-SLR-SRF, Dkt. No. 78 (D. Del. Jan. 6, 2017).) Messrs. Lindsey and Schwartz have abided by their ethical obligations and the restrictions of these protective orders and have never been accused otherwise.

Meril has not offered a substantive rebuttal to the protections proposed by Edwards and consistent with the approved model for this District. The protections proposed by Edwards are warranted given Meril's propensity to overuse confidentiality designations. Indeed, as but one example, Meril designated its entire initial production of documents as "Highly Confidential - ***Outside*** Attorneys' Eyes Only" only to reproduce the lion's share without any confidentiality designation ***after*** Edwards objected in writing on multiple occasions that many of the documents designated as "Highly Confidential - Outside Attorneys' Eyes Only" ***were presented in public at a conference***. Since then, Meril has continued to overuse the HCAEO designation (847 of 1,482 non-prior art documents produced), impeding the ability of these in-house lawyers to manage this case. These overdesignations will likely be the subject of future motion practice. Assuming Meril will designate the data underlying its alleged false advertising as "HCAEO," in-house counsel is in the best position to assess the underlying data, and provide input regarding further analysis needed from technical experts. They cannot do so absent access to HCAEO materials, and Edwards will be unreasonably prejudiced if it must challenge Meril's overbroad HCAEO designations each time a production is made. Meril's insistence on having a HCAEO tier should therefore be rejected, and Edwards submits that the Court should enter the protective order in the form proposed by Edwards.

## II.     Meril's Position

The individuals that may review Highly Confidential Information ("HC Info") under Meril's proposed protective order are identical to the default categories under this District's Model Protective Order (MPO).[2] The MPO does ***not*** include Designated House Counsel in the default list of individuals who can view HC Info and instead instructs that including Designated House Counsel is "*[o]ptional as deemed appropriate in case-specific circumstances*." The MPO requires—at a minimum—that Designated House Counsel have "***no*** involvement in competitive decision-making" and that disclosure to them is "reasonably necessary for this litigation." MPO, §7.3(b) (emphasis added). Courts have required more where the parties are direct competitors, explaining that "[t]he concern for inadvertent disclosure is particularly acute where the party seeking access to the information is a direct competitor." *Adobe Systems, Inc. v. Davachi*, No. C 10-03575 SC (LB), 2011 WL 2610170, at *5 (N.D. Cal. July 1, 2011); Dkt. 92 at 2. Edwards has identified Meril has a direct competitor and is seeking access to Meril's most sensitive HC Info, including its clinical trial protocols and data for a product that Edwards identifies as directly competing with Edwards' product. *See* Dkt. 109 at 3 (identifying Meril as a "direct competitor" of Edwards). Here, the case-specific circumstances do not warrant giving Edwards' in-house counsel access to Meril's HC Info.

First, rather that providing actual details of their current and anticipated job responsibilities (as both the MPO and case law require), the almost identical Schwartz and Lindsey declarations only

---

[2] These individuals include (a) outside counsel; (b) experts; (c) the court and its personnel; (d) court reporters and their staff; (e) professional vendors; and (f) the author or recipient of a document or a custodian or other person who otherwise possessed or knew the information.

January 27, 2021
Page Four

provide conclusory statements that "[n]one of [their] responsibilities involve competitive decision making." Schwartz Decl., ¶ 4; Lindsey Decl., ¶ 4; MPO, §7.4(a)(1) (requiring a description of "current and reasonably foreseeable future primary job duties and responsibilities in sufficient detail to determine if House Counsel is involved, or may become involved, in any competitive decision-making"). A conclusory representation that they are not involved in competitive decision-making is not acceptable. For example, in *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525 (N.D. Cal. 2000), Intel sought to disclose confidential information to its in-house counsel, who represented that she did not engage in competitive decision making. But the court found that counsel was indeed involved in competitive decisions that would place her in the "untenable position" of refusing to offer critical legal advice or risk disclosing protected information. *Id*. at 529-530. That counsel agreed to be bound by the protective order did not alter the court's conclusion. *Id*. at 530-531 ("[counsel's] good intentions are insufficient to prevent inadvertent disclosure of confidential information because it is not possible for counsel to 'lock up trade secrets in her mind'") (internal citations omitted). Here, as in *Intel*, Edwards' unilateral representation that its in-house counsel are not involved in competitive decision making and that counsel will be bound by the protective order is insufficient to protect Meril's highly sensitive information.

Moreover, what little information is in the declarations shows that both Schwartz and Lindsey ***are*** involved in competitive decision making. For example, courts have repeatedly found that in-house counsel that participate in patent proceedings—including post-issuance proceedings such as *inter partes* reviews—are involved in competitive decision making. *See, e.g.*, *Shared Memory Graphics, LLC v. Apple, Inc.*, No. C–10–2475 VRW (EMC), 2010 WL 4704420, at *2-3 (N.D. Cal. Nov. 12, 2010) (explaining concerns that litigation counsel's involvement in reexamination proceedings could "provide a tactical advantage to the patent holder," and finding it appropriate for the protective order to contain a clause "generally bar[ring] SMG's in-house counsel from accessing Defendants' highly confidential information"); *Mirror Worlds Techs., LLC v. Facebook, Inc.*, No. 17-cv-3473 (JGK), 2017 WL 5969334, at *3 (S.D.N.Y. Nov. 20, 2017) (finding that work on post-issuance proceedings is competitive decision making). In *Mirror Worlds*, the Court explained that when an attorney gains access to HC Info in a litigation, "there is a risk that the attorney will be able to use that information to shape, draft, amend or restructure strategically the scope of claims to sustain them against a challenge in a post-issuance proceeding." *Id*. at *3. Schwartz's declaration states that his duties include "managing…issues related to patent validity such as *inter partes* reviews at the U.S. Patent and Trademark Office and oppositions at the European Patent Office." Schwartz Decl., ¶ 2. Schwartz reports to Lindsey, who is Senior IP Counsel at Edwards. Lindsey Decl., ¶ 1.

In addition, both Schwartz and Lindsey state that their "primary duties" include "advising the company's leaders, including those in the individual business units." Schwartz Decl., ¶ 2; Lindsey Decl., ¶ 2. But the declarations ***do not address*** what other duties they have or which company leaders or business units they advise. In addition, rather than providing details about the scope of issues for which they advise the company's leaders, the declarations only say—in carefully chosen language—that those issues "***includ[e]…***the strategy and potential outcome of…litigations." *Id*. Indeed, Edwards represents that Lindsey's and Schwartz's duties require them to have "intimate familiarity" with Edwards' medical device practice. Moreover, Lindsey's title of "Senior IP Counsel" indicates that he advises the company's leaders on many intellectual property topics, in addition to litigations.

Second, the declarations do not show that disclosure of Meril's HC Info to Schwartz or Lindsey is necessary for this litigation. Again, the almost identical declarations only provide a conclusory

January 27, 2021
Page Five

statement that restricting their access to HC Info "would severely impact [their] ability to manage this litigation." Schwartz Decl., ¶ 3; Lindsey Decl., ¶ 3.  But there is no explanation of how or why access to HC Info is necessary to manage the litigation.  Edwards' statement above asserts that access is necessary to "evaluate materials produced in this case," "to identify the Edwards employees…that can provide background information," and "to identify experts."  It is simply not credible that Edwards' in-house counsel needs access to Meril's HC Info, such as the specifics of Meril's clinical trial protocols or raw data, to identify experts.  *See Shared Memory*, 2010 WL 4704420, at *2 (denying plaintiff's in-house counsel access to technical information regarding defendants' products); *THX, Ltd. v. Apple, Inc*., No. 13CV01161HSGDMR, 2016 WL 2899506, at *4-5 (N.D. Cal. May 13, 2016) (rejecting in-house counsel declarations as "vague" and denying their access to AEO licensing information); *Nevro Corp. v. Bos. Sci. Corp*., No. 16-CV-06830-VC (MEJ), 2017 WL 2780719, at *3 (N.D. Cal. June 27, 2017) (denying the plaintiff's request for in-house counsel to access highly confidential information because plaintiff failed to show actual prejudice).   Likewise, Meril's HC Info is not required to identify Edwards employees to provide background info.  *See id*.  Edwards has also not shown that Schwartz or Lindsey have any specialized knowledge that requires them to review Meril's HC Info personally, especially when Edwards' outside counsel and experts will have access.  *Stanislaus Food Prod. Co. v. USS-POSCO Indus*., No. 1:09-CV-00560-LJO, 2012 WL 6160468, at *5-*6 (E.D. Cal. Dec. 11, 2012) (denying plaintiff's executives access to HC Info where plaintiff did "not offer an adequate reason why its executives would need this information to litigate").  Edwards has already hired two law firms to represent it in this case, both of which proclaim to have expertise in health care and the life sciences.

Edwards' assertion that it only seeks unimportant information about "***public*** representations" is belied by its recent motion to compel (Dkt. 114) where it demands "all raw data," "adjudication protocols," and other highly confidential information about Meril's clinical trials for a product Edwards identifies as directly competing with its own product.  This information would provide a competitive advantage not only by identifying how Meril's product performs and which features are important for that performance, but also informing Edwards' patent strategy (including *inter partes* reviews), including for the patents that Edwards has asserted against Meril in this case.  The proposed prosecution bar does not obviate Meril's concerns at all and indeed specifically carves out *inter partes* reviews.  *See* Dkt. 61, Ex. A, §8; Dkt. 61, Ex. B, §8.

It also does not matter that Edwards' in-house counsel has been "granted access to HCAEO materials" in Edwards' other cases.  The MPO acknowledges that giving in-house counsel access to HC Info is "*[o]ptional as deemed appropriate in case-specific circumstances*."  Edwards does not argue that those prior cases included discovery regarding a competitor's highly sensitive clinical trial data and protocols. Whatever the "*case-specific circumstances*" were in those other cases, they do not apply here.

Finally, although not relevant to this dispute, Edwards' accusation that Meril abuses confidentiality designations is not correct.  Meril sent a draft protective order to Edwards on January 17, 2020, but Edwards refused to negotiate it until February 25.  While waiting for Edwards' response, Meril designated its documents as HCAEO to be re-designated as appropriate once the parties agreed upon confidentiality tiers.  After Edwards further delayed, Meril re-designated its documents using the tiers in its proposed protective order.  Since that time, Edwards has ***never*** complained about Meril allegedly "overus[ing] the HCAEO designation." Edwards allegations are completely unfounded.  The Court should enter the protective order in the form proposed by Meril (Exhibit A to Dkt. 61).

January 27, 2021
Page Six

STRADLING YOCCA CARLSON & RAUTH   FENWICK & WEST, LLP

By: */s/ Steven Hanle*     By: */s/ Melanie Mayer*
    Steven Hanle              Melanie Mayer
    *Attorneys for Plaintiff*        *Attorneys for Defendant*

## ATTESTATION

The undersigned attests that concurrence in the filing of the foregoing document was obtained from all signatories.

    */s/ Steven Hanle*
    Steven Hanle