1
2
3
4            UNITED STATES DISTRICT COURT
5           NORTHERN DISTRICT OF CALIFORNIA
6

7   EDWARDS LIFESCIENCES                 Case No.  19-cv-06593-HSG
    CORPORATION, et al.,
8                                        **ORDER ON MOTIONS IN LIMINE
                    Plaintiffs,          AND DAUBERT MOTIONS**
9
        v.                               Re: Dkt. Nos. 247, 250, 316, 317, 318, 322,
10                                        323
    MERIL LIFE SCIENCES PVT. LTD., et al.,
11
                    Defendants.
12

13          Plaintiff Edwards Lifesciences ("Edwards") brought this patent infringement, trademark

14   infringement, and unfair competition lawsuit against Defendant Meril Life Sciences ("Meril") on

15   October 14, 2019.  Dkt. No. 1.  Pending before the Court are various motions in limine (or

16   "MIL").  Also before the Court are Meril's motions to preclude portions of the testimony of

17   Nimesh Desai, M.D., Ph.D., and Joseph Bavaria, M.D., the medical experts for Edwards, as well

18   as the testimony of Michael Wagner, the damages expert for Edwards.  Dkt. Nos. 247, 250.  The

19   Court rules on these motions as described below and will continue to issue rulings on the

20   remaining MILs on a rolling basis.

21   **I.    BACKGROUND**

22          Both parties in this case manufacture artificial heart valves that are used to treat patients

23   with a life-threatening heart condition called aortic stenosis.  Dkt. No. 340 (or "Joint Statement of

24   the Case") at 1.  Edwards is a United States-based medical device company that offers the

25   "SAPIEN®" branded transcatheter prosthetic heart valve.  Dkt. No. 51 (or "FAC") ¶ 5.  Meril is

26   an India-based medical device company that offers the "Myval" branded transcatheter heart valve.

27   *Id.* ¶¶ 28-32.

28          Edwards filed this case in October 2019, alleging claims of patent infringement, trademark

infringement, and unfair competition.  Dkt. No. 1.  Edwards alleges that Meril has falsely advertised the safety and efficacy of its Myval heart valve, including by repeatedly misrepresenting the results of a clinical trial evaluating Myval.  Dkt. No. 350 (or "Joint Pretrial Statement") at 1.  Edwards also alleges that Meril has willfully infringed its PARTNER trademark by using PARTNER THE FUTURE as a trademark in a manner likely to cause confusion.  *Id.* The Court granted summary judgment of no patent infringement, finding that Meril's activities fell under the safe harbor of 35 U.S.C § 271(e)(1).  Dkt. No. 98.  Thus, Edwards' surviving claims for trial sound in trademark infringement and unfair competition.

## II.     LEGAL STANDARDS

### A.     Rules 26 and 37

Federal Rule of Civil Procedure 26 provides that a party must, without awaiting a discovery request, provide to the other parties:

> (i)     the name and, if known, the address and telephone number of each individual likely to have discoverable information— along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;
>
> (ii)    a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

Fed. R. Civ. P. 26(a).

Rule 26(e), in turn, provides the framework under which a party may supplement those initial disclosures.  Specifically, it states that a party who has made an initial disclosure, or who has responded to an interrogatory, request for production, or request for admission, "must supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e).

And finally, Rule 37(c)(1) provides: "If a party fails to provide information or identify a

United States District Court
Northern District of California

1    witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness

2    to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

3    justified or is harmless."  In addition, or instead, the court may also impose other appropriate

4    sanctions provided for in Rule 37.  *See* Fed. R. Civ. P. 37(c)(1)(A)-(C).  "The party facing

5    sanctions bears the burden of proving that its failure to disclose the required information was

6    substantially justified or is harmless."  *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246

7    (9th Cir. 2012).

8    **B.    Rules 402 and 403**

9        The Court has broad discretion to manage the conduct of a trial and the evidence presented

10   by the parties.  *Navellier v. Sletten*, 262 F.3d 923, 941-42 (9th Cir. 2001).  "To be admissible,

11   evidence must be relevant under Fed. R. Evid. 402 and its probative value must not be

12   substantially outweighed by the danger of unfair prejudice under Fed. R. Evid. 403."  *Hangarter v.*

13   *Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1019 (9th Cir. 2004).

14       Under Federal Rule of Evidence 401, evidence is relevant if: (a) it has any tendency to

15   make a fact more or less probable than it would be without the evidence; and (b) the fact is of

16   consequence in determining the action.  Fed. R. Evid. 401.  And under Federal Rule of Evidence

17   403, and as is true with all evidence, the Court must consider whether the probative value of

18   proffered evidence "is substantially outweighed by a danger of one or more of the following:

19   unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

20   needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The Federal Rules of Evidence

21   confer "broad discretion on the trial judge to exclude evidence on any of the grounds specified in

22   Rule 403."  *United States v. Hearst*, 563 F.2d 1331, 1349 (9th Cir. 1977); *see also United States v.*

23   *Olano*, 62 F.3d 1180, 1204 (9th Cir. 1995) ("trial courts have very broad discretion in applying

24   Rule 403") (citations omitted).

25   **C.    Rule 702**

26       Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion

27   or otherwise" where: (a) the expert's scientific, technical, or other specialized knowledge will help

28   the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   based on sufficient facts or data; (c) the testimony is the product of reliable principles and

2   methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

3   Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if the expert is qualified and if

4   the testimony is both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

5   579, 597 (1993); *see also Hangarter*, 373 F.3d 998, 1015 (9th Cir. 2004).  Rule 702 contemplates

6   a "broad conception of expert qualifications."  *Hangarter*, 373 F.3d at 1018 (emphasis in original).

7   Courts consider a purported expert's knowledge, skill, experience, training, and education

8   in the subject matter of his asserted expertise.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th

9   Cir. 2000); *see also* Fed. R. Evid. 702.  Relevance, in turn "means that the evidence will assist the

10  trier of fact to understand or determine a fact in issue."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th

11  Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that

12  the opinion testimony assist the trier of fact goes primarily to relevance.") (quotation omitted).

13  Under the reliability requirement, the expert testimony must have a "reliable basis in the

14  knowledge and experience of the relevant discipline."  *Primiano*, 598 F.3d at 565.  To ensure

15  reliability, the Court "assess[es] the [expert's] reasoning or methodology, using as appropriate

16  such criteria as testability, publication in peer reviewed literature, and general acceptance."  *Id.* at

17  564.

18  **III.    DISCUSSION**

19      **A.    Meril's Motion in Limine No. 1**

20          Meril contends that, under Rule 37, Edwards should be precluded from offering: (a) new

21  theories of liability not disclosed in discovery; (b) damages theories and evidence that were not

22  timely disclosed; and (c) testimony from witnesses who were not made available for deposition, or

23  on issues for which Edwards failed to provide a Rule 30(b)(6) witness.[1]  Dkt. No. 316.  The Court

24  finds that even if Edwards failed to timely disclose its theories of liability or damages as Meril

25  alleges, Meril has not shown that it was harmed by any such failure.

26          Meril first argues that Edwards has impermissibly attempted to broaden the bases for its

27  

28  [1] Meril's final argument is mooted by the Court's order requiring Edwards to make Larry Wood and Pooja Sharma available for deposition before trial.  *See* Dkt. No. 361.

United States District Court
Northern District of California

1    false advertising claim after the close of discovery by including in the Joint Pretrial Statement

2    three new allegedly false statements that Edwards failed to disclose in its interrogatory response.

3    *See id.* at 2-3.  But Meril has not shown that it was harmed by this disclosure, because Meril's own

4    physician expert, Dr. Ramesh Daggubati, fully addresses each of the new false statements at

5    length in his report, which was filed before the close of fact discovery.  *See* Dkt. No. 295-3.

6         Meril also seeks to preclude Edwards from seeking Lanham Act damages for loss of

7    goodwill or corrective advertising on the ground that Edwards failed to timely disclose those

8    theories.  *See* Dkt. No. 316 at 3-4.  Specifically, Meril claims that Edwards' initial disclosures

9    failed to provide notice that Edwards sought damages for those theories, and that Edwards further

10   failed to timely disclose its calculations and the underlying documents that its damages expert, Mr.

11   Wagner, ultimately relied on in response to Meril's interrogatories.  *Id.* at 4.

12        The Court again finds that exclusion under Rule 37 is unwarranted because Meril has not

13   shown that it suffered harm.  Meril was on notice that Edwards seeks damages for loss of goodwill

14   and corrective advertising because Edwards' June 14, 2021 and July 9, 2021 interrogatory

15   responses, respectively, said as much well before the close of fact discovery.  *See* Dkt. Nos. 290-1

16   at 15, 23; 250-2 at 18, 27.  Likewise, Meril had ample opportunity before the close of fact

17   discovery to explore and respond to the calculations and documents on which Mr. Wagner's report

18   relied, whether through depositions or Meril's rebuttal expert report.  Dkt. Nos. 290 at 2-3; 207-5;

19   208-5.  Accordingly, the Court **DENIES** Meril's motion.

20        **B.    Meril's Motion in Limine No. 2**

21        Meril moves to preclude Edwards from referring to or presenting evidence of "unrelated

22   alleged bad acts" under Federal Rule of Evidence 403 and 404.  Dkt. No. 317 at 2.  Meril's motion

23   is **GRANTED IN PART and DENIED IN PART.**

24        Under Federal Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to

25   prove a person's character in order to show that on a particular occasion the person acted in

26   accordance with the character."  Fed. R. Evid. 404(b)(1).  But "other act" evidence may be

27   admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence

28   of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

United States District Court
Northern District of California

1    Edwards' FAC includes a section titled "Meril's Pattern of Copying Edwards' Intellectual

2  Property," which alleges that Meril's "Instructions for Use" for Myval improperly copied from

3  Edwards' copyrighted instructions, and that Meril applied for a MAGMA trademark in Europe in

4  2015 to imply an association with Edwards, which owns a prior registration of the trademark

5  MAGNA.  FAC ¶¶ 53-58.

6    Edwards seeks to introduce evidence of Meril's prior MAGMA trademark, Meril's

7  Instructions for Use (IFU) for Myval, and the visual similarities between Meril's Myval valve and

8  Edwards' SAPIEN 3 valve, to demonstrate Meril's intent under FRE 404(b).  Dkt. No. 337 at 2.

9  Edwards argues that this evidence is necessary to prove that Meril's trademark infringement was

10  willful and to negate Meril's fair use defense.  *Id.*  As Meril sees it, Edwards intends to present

11  these arguments as impermissible "bad acts" evidence.  Dkt. No. 317 at 2-3.  Meril also contends

12  that Edwards should not be permitted to argue to the jury that Meril improperly "copied" its

13  Sapien device, particularly since this Court has already granted Meril's motion for summary

14  judgment regarding the patent infringement claims.  *Id.* at 3; Dkt. No. 98.

15    The Court finds under Rule 403 that any probative value of Meril's alleged copying is

16  substantially outweighed by the danger that the evidence will confuse the issues, mislead the jury,

17  unfairly prejudice Meril, and waste time.  To begin with, evidence of Meril's alleged "copying" is

18  of minimal relevance to Edwards' Lanham Act claims.  As both the U.S. Supreme Court and the

19  Ninth Circuit have made clear, "[c]opying is dealt with through the copyright and patent laws, not

20  through trademark law."  *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008,

21  1016 (9th Cir. 2018); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003).

22  Moreover, Edwards' attempts to prove that Meril's MAGMA trademark, Instructions for Use, and

23  Myval product "copied" Edwards' intellectual property would almost certainly lead to an

24  impermissible and prejudicial propensity inference against Meril.

25    Evidence of the visual similarities between Meril's Myval valve and Edwards' SAPIEN 3

26  valve also has minimal, if any relevance in this case.  The visual similarities between the two

27  artificial heart valves provide, at best, scarce support for the conclusion that Meril intentionally

28  falsified its data to promote Myval.  And while the "proximity of the goods" may be a relevant

6

factor in determining whether consumers were likely to be deceived by Meril's use of the

PARTNER THE FUTURE mark,[2] there is no dispute here that the parties offer related products,

since both admittedly make artificial heart valves.  *See* Joint Statement of the Case at 1 ("Both

parties in this case manufacture artificial heart valves that are used to treat patients with a life

threatening heart condition called aortic stenosis.").  Accordingly, the Court **GRANTS** Meril's

motion.  Edwards may not present evidence about the MAGMA-MAGNA trademark dispute,

Meril's Myval Instructions For Use, or the visual similarities between the Myval Valve and

Edwards' SAPIEN 3 Valve.

Meril also contends that Edwards should not be permitted to argue to the jury that Meril

"fabricated" data to support its statements at the TCT conferences because Meril "has no ability to

alter any of the data in the database" and because Edwards' fabrication theory is "inconsistent with

other documents and evidence."  *See* Dkt. No. 317 at 5.  This request is **DENIED.**  Evidence

regarding Meril's alleged fabrication of data is not Rule FRE 404(b) evidence.  Instead, it is direct

evidence relevant to whether Meril "intentionally" falsified its advertised data and whether the

purportedly false data is material.

### C.    Meril Motion in Limine No. 3

Edwards' trial exhibit list includes a document that Meril filed with a European regulatory

agency called the Polish Center for Testing and Certification ("PCTC Report").  *See* Dkt. No. 350-

3.  Meril seeks to exclude reference to the PCTC Report as irrelevant to Edwards' false advertising

claims.  Dkt. No. 318 at 2.

As the Court understands it, Edwards' theory of relevance for the PCTC Report proceeds

as follows.  In February 2019, Meril submitted false data to the PCTC about the safety and

efficacy of Myval.  Dkt. No. 292 at 20.  Edwards claims that the PCTC granted a "CE Mark" in

April 2019, approving Myval for sale in Europe based on that false data.  *Id.*  After Meril obtained

its CE Mark, Meril "proudly advertised" that Myval was "CE APPROVED."  *Id.*  So Edwards

contends that Meril's statement that Myval is "CE APPROVED," which no one disputes is

---

[2] *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

1  literally true, is nevertheless misleading because "the approval was based on false data." *Id.* at 20-

2  21.

3       The Court is skeptical that, under the facts of this case, Edwards can state a plausible

4  Lanham Act claim based on Meril's statement that Myval was approved by Polish regulators.

5  Such a claim would at minimum necessitate evidence that Polish regulators at least in part based

6  their approval of Myval on Meril's allegedly false data.[3]  On the eve of trial, however, the record

7  is bare as to how the PCTC made its decision to grant CE approval or what data it found material.

8  And Edwards has provided no authority for the proposition that it has a private cause of action to

9  challenge a foreign regulator's approval of a medical device.  This lack of evidence and authority

10  may be why Edwards assures the Court that it is "not asking the jury or the Court to find that

11  Myval should not have been approved by the PCTC."  Dkt. No. 353 at 5.  But how that can be?  If

12  the PCTC *should have* approved Myval, then on what grounds could Edwards plausibly argue that

13  Meril's statement that Myval is CE approved is false or misleading?  Perhaps sensing this, Meril

14  devotes a portion of its briefing on this issue to addressing the materiality of its data and defending

15  the PCTC's regulatory approval.  *See* Dkt. No. 318 at 4-5.

16       The Court will not allow this case to devolve into a wasteful and confusing mini-trial about

17  whether Polish regulators should or should not have given CE approval to Myval.  The jurors

18  cannot answer this question based on the evidence in this case, and they should not be asked to do

19  so.  To the extent the PCTC Report bears any relevance to a plausible Lanham Act claim—a

20  proposition as to which the Court is skeptical—that relevance is substantially outweighed by the

21  risk of confusing the issues, misleading the jury, and wasting time.  *See* Fed. R. Evid. 403.

22  Accordingly, Edwards may not reference the PCTC Report as evidence that Meril's advertising of

23  Myval as CE approved was misleading.  For these same reasons, Edwards may not reference the

24

25  _____

[3] Edwards understands this point.  It has repeatedly alleged that the PCTC based its approval of
26  Myval on Meril's allegedly false data.  Dkt. Nos. 292 at 20 ("*Based on that false data*, the PCTC
granted a CE Mark in April 2019, approving Myval for sale in Europe.") (emphasis added), 21
27  ("[B]ut in this case and not disclosed by Meril, *the approval was based on false data*.") (emphasis
added); 353 at 3 ("[T]he PCTC Report is directly relevant to proving that Meril's advertisement of
28  CE approval *based on falsified data* was highly misleading.") (emphasis added).  Curiously,
however, none of these allegations are followed by citations to the record.

United States District Court
Northern District of California

1   PCTC Report as evidence supporting the materiality and tendency to deceive elements of its

2   Lanham Act false advertising claim.  *See* Dkt. No. 353 at 2.

3       Separately, Edwards contends that the average 12-month Kansas City Cardiomyopathy

4   Questionnaire ("KCCQ") score stated in Meril's PCTC Report is relevant because it contradicts

5   the KCCQ score that Meril publicly advertised at TCT 2019.  *Id.*  If true, the PCTC Report's

6   KCCQ data would bear independent relevance as direct evidence going to whether one of Meril's

7   representations at issue in this case was false, and would not unfairly prejudice Meril.  Edwards

8   accordingly may reference the KCCQ score in the PCTC Report as evidence it claims shows the

9   falsity of Meril's representations at TCT 2019, but without further elaboration regarding the

10  approval process.  In sum, Meril's motion is **GRANTED IN PART and DENIED IN PART.**

11      **D.    Edwards Motion in Limine No. 1**

12      Meril moves to preclude certain testimony of Edwards' damages expert, Michael Wagner,

13  referencing Judge Alsup's *Daubert* ruling in *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939

14  WHA, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ("*Waymo* Order").  *See* Dkt. 250 at 11-12.  In

15  the present motion, Edwards seeks to exclude at trial any reference to a *Daubert* ruling.  Dkt. No.

16  322.  In response, Meril states that it does not seek to admit the *Waymo* Order into evidence at

17  trial, but contends that Mr. Wagner's prior litigation experience, including the fact that prior courts

18  or juries have not always agreed with his analysis and conclusions, is "highly probative" for

19  impeachment, bias, credibility, and the weight his testimony should be given.  *See* Dkt. No. 341.

20      As a general matter, references at trial to another court's prior *Daubert* ruling create a risk

21  of unfair prejudice that usually substantially outweighs any probative value.  Because *Daubert*

22  rulings come from judges, juries may give them undue weight, which can create a substantial risk

23  of unfair prejudice.  *See BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-CV-01370-EJD, 2018

24  WL 1569703, at *3-4 (N.D. Cal. Mar. 30, 2018).  And allowing parties to reference prior *Daubert*

25  rulings invites wasteful and confusing mini-trials about the facts and circumstances of the prior

26  case in question.  *See Est. of Thompson v. Kawasaki Heavy Indus., Ltd.*, 933 F. Supp. 2d 1111,

27  1152 (N.D. Iowa 2013).  However, without knowing how Mr. Wagner will testify about his

28  credibility or prior litigation experience, the Court is not prepared to categorically exclude any

United States District Court
Northern District of California

1    reference to any order that has ever excluded Mr. Wagner's expert testimony, including Judge

2    Alsup's *Waymo* Order.  The Court will accordingly tentatively **GRANT** Edwards' motion, but

3    without prejudice to Meril raising this argument later depending on what Mr. Wagner says at trial.

4         **E.    Edwards Motion in Limine No. 2**

5         On October 27, 2021, Judge Westmore granted Edwards' motion to compel Meril to

6    produce documents relating to its foreign sales.  Dkt. No. 267.  Edwards contends that Meril

7    responded by producing "litigation-driven" spreadsheets instead of profit and loss statements or

8    other documents kept in the ordinary course of business.  Dkt. No. 323.  Edwards' accordingly

9    now seeks to exclude Meril from presenting evidence of its costs or profit margin for Myval or its

10   associated products under Rule 37(c)(1).  *Id.*

11        After reviewing the record, the Court finds no basis to exclude Meril from presenting such

12   evidence under Rule 37.  Meril's production was timely.  Meril properly objected to Edwards'

13   discovery request and, after Judge Westmore resolved the discovery dispute, timely produced

14   documents by the deadline imposed by Judge Westmore's order.  *See* Dkt. Nos. 181, 267, 323 at 1.

15   And Edwards has not shown that it was harmed by the timing of Meril's production.  As Edwards

16   admits, Meril produced a witness to testify regarding Myval expenses, and Edwards deposed this

17   witness on December 30, 2021.  *See* Dkt. No. 323 at 2 n.1.

18        The Court also notes that Meril appears to have complied with the substance of Judge

19   Westmore's order.  The order directed Meril to produce documents related to its "[w]orldwide

20   sales information[.]"  *See* Dkt. No. 267.  In response, Meril produced documents that, Edwards

21   admits, show Meril's annual "Profit before Litigation Cost & Damages" by country and by

22   quarter.  *See* Dkt. No. 323 at 1.  Edwards may now contend that Meril must produce a "profit and

23   loss statement kept in the ordinary course of Meril's business," but the proper vehicle for such a

24   request would have been another motion to compel, not a motion in limine.  *See Patelco Credit*

25   *Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001) (affirming a district court's denial of a motion

26   in limine because "[a] motion to compel pursuant to Rule 37 is the proper vehicle to address

27   instances where the responding party fails to make or cooperate in providing the requested

28   discovery.").  Edwards' motion is **DENIED.**

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.      Meril's Motion to Preclude Certain Testimony of Nimesh Desai and Joseph Bavaria**

Edwards seeks to introduce testimony from its medical experts, Nimesh Desai and Joseph Bavaria.  Meril argues that various parts of this testimony fall outside of their expertise, are speculative, are not relevant, and would be unfairly prejudicial to Meril.  *See* Dkt. No. 247. Having considered the parties' arguments, the Court **GRANTS IN PART and DENIES IN PART** Meril's motion.

**i.      Testimony from Desai and Bavaria that is Not Set Forth in Their Expert Reports**

Meril contends that Edwards improperly seeks to have both Dr. Desai and Dr. Bavaria provide testimony based on information not included in their expert reports but rather based on information that Edwards' own counsel elicited at the end of their depositions.  Dkt. No. 247.

Edwards does not dispute that its own counsel elicited new opinion testimony from Drs. Desai and Bavaria through questions at the end of their depositions, but instead raises two arguments.  Dkt. No. 292 at 12.  First, Edwards argues that this maneuver was authorized by Rule 26(e), which allows experts to supplement their opinions or disclose additional opinions during expert discovery.  Dkt. No. 292 at 12.  Second, Edwards argues that, in any event, exclusion under Rule 37 is unwarranted because any failure to disclose the expert reports did not prejudice Meril. *Id.*

The Court finds both of Edwards' arguments unpersuasive.  This Court agrees with the courts in this district that have recognized that, under Rule 26 of the Federal Rules of Civil Procedure, "subsequently-given deposition testimony is not a substitution for adequate disclosure in the expert's original report." *Asetek Danmark A/S v. CMI USA, Inc.*, No. 13-CV-00457-JST, 2014 WL 6997670, at *1 n.1 (N.D. Cal. Dec. 9, 2014); *see also Pajas v. Cty. of Monterey*, No. 16-CV-00945-BLF, 2019 WL 188660, at *3 (N.D. Cal. Jan. 14, 2019).  Moreover, the Court finds that Edwards' surprise tactics at the expert depositions were not "substantially justified" or "harmless" under Rule 37 because they left Meril's counsel unable to effectively prepare for those depositions.

Meril's motion is accordingly **GRANTED** as to Drs. Desai's and Bavaria's expert

testimony about opinions not disclosed in their expert reports, including new opinions they provided in response to questioning from Edwards' counsel at their depositions.  This includes their purported testimony about the PCTC Report.

Meril also argues that Edwards improperly tried to expand the scope of Dr. Desai's 11-page expert report by including a paragraph in which Desai purports to "incorporate by reference in full," and adopt as his own, all the opinions in Dr. Bavaria's 60-page expert report.  Dkt. No. 247 at 11.  The Court agrees.  Dr. Desai's purported wholesale incorporation of a report spanning sixty pages, with no additional independent analysis, does not comply with Rule 26's requirement that the expert report itself include not only a "complete statement of all opinions witness will express," but also the "basis and reasons" for those opinions as well as "the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B).  Meril's motion is **GRANTED** on this basis.

### ii.    Testimony from Desai or Bavaria About Meril's Intent, Motive, or State of Mind

Dr. Desai's report contains a section titled "Meril Intentionally Presented False Data Regarding Its Myval-1 Study."  Dkt. No. 247-3 (or "Desai Rpt.") ¶¶ 27-41.  There, Dr. Desai analyzes mean and peak aortic-valve gradient data presented by Meril at two different cardiovascular conferences and concludes that "it is almost certain" that Meril possessed correct data at the time of the first conference, but then "systematically changed the data to understate the gradients and overstate the hemodynamic efficacy of the Myval device" at the second conference. *Id.*  Dr. Desai further concludes that "Meril repeatedly and intentionally manipulated the reported echocardiographic data from its Myval-1 study."  *Id.* ¶ 41.

Meril contends that Dr. Desai's opinions on Meril's intent, motive, or state of mind should be excluded as irrelevant, speculative, and unfairly prejudicial under FRE 403.  Dkt. No. 247 at 12.  In response, Edwards argues that Meril's intent to deceive consumers is relevant to Edwards' false advertising claims because it creates certain presumptions with respect to the deception and reliance factors.  Dkt. No. 292 at 24.  Edwards also argues that Dr. Desai's analysis is necessary to rebut Meril's argument that its alleged misrepresentations were immaterial, or were "typographical

errors." *Id.*

Since Meril will argue at trial that its alleged misrepresentations were immaterial, or just "typographical errors," the Court finds that statistical analysis of Meril's data conceivably could be relevant to the ultimate question of whether Meril "intentionally" misled consumers. *See William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 257 (9th Cir.) (recognizing that if a defendant "intentionally misled" consumers, then courts may presume that "consumers were in fact deceived" and the burden shifts to the defendant to prove otherwise), *supplemented sub nom. William H. Morris Co. v. Grp. W. Inc.*, 67 F.3d 310 (9th Cir. 1995).

To the extent Dr. Desai is qualified to do so,[4] he may explain the differences in the mean and peak aortic-valve gradient data that Meril presented at the 2018 EuroPCR conference, 2018 TCT conference, and the 2019 EuroPCR conference, including whether the differences in the data presented follow a pattern. *See* Desai Rpt. ¶¶ 27-38. But that is where his helpfulness ends. Once this analysis is presented, the Court agrees with Meril that the jury is sufficiently capable of drawing its own inferences regarding what Meril may have intended. Therefore, neither Dr. Desai nor Dr. Bavaria may testify that Meril "intentionally" presented false data. And for this same reason, Dr. Desai may not opine that Meril's statement that its presentation included typographical errors is "false to a scientific certainty." *See* Desai Rpt. ¶ 37, 39-41.

### iii. Testimony from Desai about Meril's Alleged "Professional," "Ethical," and "Regulatory Body" Obligations

Section V(B) of Dr. Desai's expert report is titled "Meril's Professional Obligations Require It to Maintain Accurate Records of the Myval-1 Study's Underlying Data." *See* Desai

---

[4] Dr. Desai is an expert in the field of cardiovascular surgery and interventional procedures, but he is not a statistician. While he is qualified to provide background information on heart valve replacement procedures and techniques, the basis for any claimed expertise in biostatistics is less clear. The entire purported basis for his qualifications to provide biostatistical analysis appears to be one sentence in his report, in which he states without further elaboration that he "also ha[s] extensive experience and training in biostatistics, including in the collection and analysis of data from cardiovascular clinical studies and the interpretation of the results from such studies." Desai Rpt. ¶ 11. The Court is not prepared to find Dr. Desai qualified to provide biostatistical analysis based on this statement alone, and may decide that a pretrial *Daubert* hearing is warranted on this issue.

Rpt. ¶¶ 18-26.  In this section, Dr. Desai spends several paragraphs explaining how Meril has failed to adhere to its professional and ethical obligations to preserve the underlying data from its Myval-1 study.  *Id.*   He also explains that Meril has failed to comply with Good Clinical Practice (GCP) guidelines, which is an international standard that governs ethical aspects of clinical research.  *Id.*

Meril argues that these opinions should be excluded because they are: (1) not relevant to any issue the trier of fact will be asked to decide; (2) outside of Dr. Desai's expertise; and (3) unfairly prejudicial under FRE 403.  *See* Dkt. No. 247 at 15.  Edwards contends that Dr. Desai's explanation and opinions concerning the GCP Guidelines are "directly relevant" to highlight Meril's inability to provide underlying data supporting its claim that it corrected its false representations of the results of the Myval-1 study.  Dkt. No. 292 at 17.

The background for these arguments is a long-running discovery dispute.  Edwards alleges, and Judge Westmore has found, that Meril violated either its discovery or document retention obligations by repeatedly failing to produce medical records and other documents underlying its Myval-1 clinical studies.  *See* Dkt. No. 369.

If Meril engaged in discovery misconduct, then that can and will be addressed by this Court.  But the Court will not allow this discovery dispute to continue to play out in front of the jury.  At bottom, whether and to what extent Meril's document retention complied with the GCP guidelines is ultimately too attenuated to any issue the jurors will be asked to decide.  Allowing the parties to provide dueling extrinsic evidence, testimony, and argument about whether Meril did or did not comply with GCP retention guidelines would create a danger of misleading the jury, wasting time,  and confusing the issues that would substantially outweigh any probative value.  Therefore, Meril's Motion is **GRANTED** on this basis.  Dr. Desai may not testify that Meril has failed to adhere to its professional and ethical obligations to preserve the underlying data from its Myval-1 study or has failed to comply with GCP guidelines.

//

//

//

United States District Court
Northern District of California

### iv.   Testimony from Bavaria About the Harm that Edwards Allegedly Suffered

In the final two sections of Dr. Bavaria's report, he opines that "Meril's false reporting of its Myval-1 data harmed Edwards' reputation among physicians who were exposed to Meril's false reporting." *See* Dkt. 247-2 (or "Bavaria Rpt.") at 48.  He also claims that Meril's use of the term "PARTNER THE FUTURE" at the TCT 2019 conference harms Edwards by confusing viewers into connecting Edwards' PARTNER® trials to Meril's product, Myval.  *See id.* at 50.

Meril argues that Dr. Bavaria's opinions about the harm Edwards allegedly suffered are based on "pure speculation" and therefore inadmissible as expert testimony.  *See* Dkt. No. 247 at 22-23.  Meril also objects to Dr. Bavaria's characterization of Edwards as an "innovator" and Meril as a "copier" in this context.  *Id.* at 18-20.  In response, Edwards argues that Dr. Bavaria's opinion properly explains how Meril's conduct harmed Edwards' reputation, particularly among the TAVR physicians who were allegedly exposed to the false reporting.  Dkt. No. 292 at 13.

To begin with, neither Dr. Bavaria nor Dr. Desai may disparage Meril by calling it a "copier."  As the Court has already explained, evidence of Meril's alleged copying is of minimal relevance to Edwards' Lanham Act claims.  *OTR Wheel Eng'g, Inc.*, 897 F.3d at 1016 ("Copying is dealt with through the copyright and patent laws, not through trademark law.").  And any probative value this testimony may have is substantially outweighed by the risk of unfair prejudice flowing from the witness' characterization of the motives and relative merits of the parties themselves.  *See Morton & Bassett, LLC v. Organic Spices, Inc.*, No. 15-CV-01849-HSG, 2017 WL 3838097, at *9 (N.D. Cal. Sept. 1, 2017).

Also, after carefully reviewing Dr. Bavaria's report, the Court will not allow Dr. Bavaria to offer expert testimony about the harm Edwards allegedly suffered because such testimony is not based in any specialized expertise he has.  While Dr. Bavaria is an accomplished cardiac surgeon, he does not apply specialized medical or scientific expertise in any way in opining that Meril's conduct harmed Edwards' business reputation.  While not necessarily required, one standard method for gauging the relevant consumer base's reaction to allegedly false statements is conducting market analysis and consumer surveys.  *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) (marketing research expert gauged consumer reactions to

15

United States District Court
Northern District of California

1    allegedly false advertisements through a multi-phased survey).  Dr. Bavaria's report, in contrast,

2    simply summarizes evidence already in the record and asserts that, if physicians were to believe

3    Meril's allegedly false data, "it would indicate that Meril achieved in a short amount of time what

4    Edwards and others have been unable to achieve with more time and resources," and "would

5    undermine Edwards' reputation as a leading TAVR device developer."  Bavaria Rpt. ¶¶ 151-161.

6         The same is true of Dr. Bavaria's testimony that Meril's use of the term "PARTNER THE

7    FUTURE" is "misleading and harms Edwards."  Bavaria Rpt. ¶¶ 162-176.  In this section, Dr.

8    Bavaria summarizes record evidence while making either obvious or conclusory observations

9    about promotional content that Meril allegedly used in connection with certain conferences.  *Id.*

10   He then concludes that "Meril used the term 'PARTNER THE FUTURE' at the TCT 2019

11   conference to confuse the viewer into connecting the well-regarded PARTNER® trials to its own

12   product, Myval," thereby harming Edwards' reputation and its PARTNER® brand.  *Id.*

13        Both sections are not based on any specialized expertise.  Dr. Bavaria "merely summarizes

14   the record evidence and gratuitously interprets it" with a conclusion that offers nothing more than

15   what Edwards' counsel could argue to the jury in closing arguments.  *See Lord Abbett Mun.*

16   *Income Fund, Inc. v. Asami*, No. C-12-03694 DMR, 2014 WL 3417941, at *13 n.8 (N.D. Cal. July

17   11, 2014), *aff'd*, 653 F. App'x 553 (9th Cir. 2016).  Dr. Bavaria is a scientific and medical expert,

18   but he has no specialized qualifications that support what amounts to nothing more than a

19   recitation of Edwards' theory of the case.  Meril's motion is accordingly **GRANTED**, and Dr.

20   Bavaria's opinions about the harm Edwards allegedly suffered are excluded.

21        **G.    Meril's Motion to Preclude Certain Testimony of Michael Wagner**

22        Edwards seeks to introduce testimony from its damages expert, Michael Wagner.  Meril

23   seeks to preclude Mr. Wagner's opinions regarding (1) loss of goodwill, (2) prospective corrective

24   advertising, and (3) disgorgement of Meril's foreign profits on the ground that they lack relevance

25   and reliability.  Dkt. No. 250.  The Court **GRANTS IN PART and DEFERS IN PART** Meril's

26   motion.

27   //

28

### i.   Loss of Goodwill

In *Skydive Ariz. v. Quattrochi*, the Ninth Circuit explained that to measure the harm to a plaintiff's goodwill in a Lanham Act case, "a jury may consider a plaintiff's expenditures in building its reputation in order to estimate the harm to its reputation after a defendant's bad acts." 673 F.3d 1105, 1112-13 (9th Cir. 2012).  Citing *Skydive*, Mr. Wagner's report calculates that Edwards spent approximately $1.7 billion building its goodwill in the PARTNER trademark and SAPIEN product line.  Dkt. No. 250-7 (or "Wagner Rpt.")  ¶¶ 43-65.  The $1.7 billion figure includes not only the sales and marketing expenses Edwards incurred promoting the SAPIEN 3 product, but also the "research and development expenses" Edwards incurred for the SAPIEN 3 platform, as well as the costs of different clinical trials for Edwards' SAPIEN 3 platform.  *Id.*

Meril objects to Mr. Wagner's inclusion of research and development expenses.  Meril contends that the Court should preclude Mr. Wagner's $1.7 billion loss of goodwill opinion testimony because it is not relevant, not a product of reliable principles and methods, and not helpful to the trier of fact.  Dkt. No. 250 at 8-9.  After reviewing Mr. Wagner's report, the Court agrees that Mr. Wagner's "cost methodology" underlying his $1.7 billion loss of goodwill opinion lacks expertise and is not reliable testimony within the meaning of Rule 702.  *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ( "[T]he court must assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance").

To begin with, Mr. Wagner's methodology does not have a "reliable basis in the knowledge and experience of the relevant discipline."  *Id.* at 565.  He does not identify any authority in the fields of economics or marketing that explains why an appropriate measure of goodwill in a brand or trademark includes the amount a firm spent on research and direct product development, as opposed to advertising or marketing.  Instead, to the extent Mr. Wagner explains his cost methodology, it is in the following paragraph:

> As the Ninth Circuit recognized in *SkyDive Arizona*, another metric that courts have considered in the determination of Plaintiff's loss of goodwill / harm to reputation is the amounts spent by Plaintiffs to develop and promote the trademark or brand. Under the cost methodology, such amounts spent would be considered an estimate

1    of the value of the trademark or brand. Therefore, I summarize the
     amounts spent by Plaintiffs to develop and promote the SAPIEN 3
2    product and the PARTNER trials.

3    Wagner Rpt.  ¶ 56.

4          There are no discernible "principles" or "methods" in this analysis.  Instead, the extent of

5    Mr. Wagner's methodology appears to be a cite to the Ninth Circuit's decision in *Skydive*.  But

6    even then, Mr. Wagner misreads that case.  The *Skydive* court found the plaintiff's "*advertising*

7    expenditures" relevant to determining the expenditures it made in building its reputation.  673

8    F.3d at 1112 (emphasis added).  *Skydive* does not support the proposition that plaintiffs may

9    present evidence of their product research and development expenses to establish the value of their

10   trademarks and goodwill.[5]  In short, Mr. Wagner's "methodology" cannot be his misreading of

11   caselaw, and he provides no other basis for his inclusion of product research and development

12   expenses.

13         Accordingly, the Court finds that Mr. Wagner's $1.7 billion loss of goodwill opinion is

14   unreliable and lacks specialized expertise.  Mr. Wagner may not testify that Edwards spent $1.7

15   billion building its goodwill.  He also may not testify about the research and development

16   expenses Edwards incurred for the SAPIEN 3 platform or the costs of different clinical trials for

17   Edwards' SAPIEN 3 platform.

18   //

19   //

20

21   [5] Edwards cites three district court decisions for the proposition that factfinders may consider
     "product research and development expenses" to determine the value of a firm's trademarks and
22   goodwill.  Dkt. No. 289 at 9.  Two are out-of-circuit district court trademark counterfeiting cases
     in which the courts, with little analysis, appear to consider product research, development and
23   manufacturing costs while awarding statutory damages in default judgments.  *See Luxottica
     Group, S.p.A. v. Casa Los Martinez Corp.*, No. 14-cv-22859, 2014 WL 4948632, at *4 (S.D. Fla.
24   Oct. 2, 2014); *Coach, Inc. v. Class Beach Wireless, LLC*, No. 12-cv-22748, 2013 WL 12095144,
     at *4 (S.D. Fla. Mar. 21, 2013).  In the other case, Judge Davila merely noted that the plaintiff had
25   "spent decades investing in and building the goodwill in its brand and reputation for designing,
     making, and selling high quality products" while finding that the plaintiff was likely to suffer
26   irreparable harm in the context of a TRO.  *Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, No.
     5:20-CV-04773-EJD, 2020 WL 5199434, at *8 (N.D. Cal. Aug. 17, 2020).  Putting aside that
27   these cases have nothing to do with the reliability or depth of Mr. Wagner's methodology, the
     Court does not find them to be binding or persuasive authority as to whether factfinders in a
28   Lanham Act case may consider product research and development expenses to determine the value
     of a firm's trademarks and goodwill.

United States District Court
Northern District of California

United States District Court
Northern District of California

### ii.    Corrective Advertising

Mr. Wagner's report estimates the cost of Edwards' future advertising campaign in the United States to address the alleged harm caused by Meril's alleged trademark infringement and false advertising.  Wagner Rpt. ¶¶ 66-82.  Edwards clarifies that, at trial, Mr. Wagner will not testify as to the necessity or reasonableness of the scope of Edwards' campaign.  Dkt. No. 289 at 13.  Rather, Mr. Wagner's testimony would only address the total cost of the campaign.  *Id.*  Meril argues that such testimony should be excluded under FRE 702 as lacking specialized expertise.  Dkt. No. 250 at 15.

The Court agrees with Meril.  After reviewing Mr. Wagner's analysis, the Court finds that it lacks the kind of specialized expertise that Rule 702 requires.  As Edwards concedes, Mr. Wagner's calculations are not complicated.  Dkt. No. 289 at 13.  Mr. Wagner first adopted Edwards' estimated costs of developing a white paper and marketing document.  Wagner Rpt. ¶¶ 71-72.  He then adopted Edwards' assumption that it would need to have its sales force engage directly with cardiologists by meeting with them, as well as Edwards' estimate that its sales force would need to meet with 4000 heart valve implanters.  *Id.* ¶ 72.  As far as calculations go, Mr. Wagner did two things.  He multiplied a generic hourly rate of salespersons, which he appears to have found on the U.S. Bureau of Labor's website, by the 4000 sales visits to arrive at a total labor cost.  *Id.*  Then he added that amount to the costs total that Edwards provided him.  *Id.*

This testimony is unhelpful.  Edwards' underlying estimates must independently come into evidence, and Edwards' counsel can easily perform Mr. Wagner's basic arithmetic for the jury during their closing argument.  Meril's motion is **GRANTED** as to Mr. Wagner's testimony regarding the total cost of Edwards' future advertising campaign.

### iii.    Disgorgement Opinion

Meril seeks to preclude Mr. Wagner from testifying about the amount of sales and profits Meril should disgorge.  Dkt. No. 250 at 21.  Because the parties agree that, if there is a liability verdict, disgorgement will be a post-trial issue for the Court, the Court defers ruling on this issue.

//

//

1    **IT IS SO ORDERED.**

2    Dated:  1/27/2022

3

4    HAYWOOD S. GILLIAM, JR.
     United States District Judge